915 A.2d 1165

**TIRE JOCKEY SERVICE, INC., Appellee,**

**v.**

**COMMONWEALTH of Pennsylvania, DEPARTMENT OF ENVIRONMENTAL PROTECTION, Appellant.**

Supreme Court of Pennsylvania.

Argued April 11, 2005.

Decided Feb. 20, 2007.

Anderson Lee Hartzell, Esq., William H. Blasberg, Esq., PA Department of Environmental Protection, Conshohocken, for Department of Environmental Protection.

Douglas Maloney, Esq., Begley, Carlin & Mandio, L.L.P., Langhorne, for Tire Jockey Service, Inc.

BEFORE: CAPPY, C.J., and CASTILLE, NIGRO, NEWMAN, SAYLOR, EAKIN and BAER, JJ.

## *OPINION*

Justice CASTILLE.

Two inter-related questions are presented for review in the instant appeal: (1) Whether the Commonwealth Court erred by failing to give the Pennsylvania Department of Environmental Protection's ("DEP") interpretation of subparagraph

(ii) of the definition of "waste" in 25 Pa.Code § 287.1 the deference to which the DEP's reasonable interpretation of environmental regulations is entitled under *Department of Environmental Protection v. North American Refractories Co.,* 791 A.2d 461 (Pa.Cmwlth.2002) and (2) Whether the Commonwealth Court erred by finding that Tire Jockey Service, Inc. ("TJS") does not "process" or "reclaim" the whole discarded tires at its facility, when the Pennsylvania Environmental Hearing Board ("EHB") had not had a previous opportunity to make findings of fact and conclusions of law with regard to that issue and a contrary finding would produce a different result? [1] For the following reasons, we reverse the order of the Commonwealth Court.

TJS, a New Jersey corporation, operates a used tire processing facility located at USX Industrial Park in Fairless Hills, Bucks County, Pennsylvania (the "Facility"). Alfred J. Pignataro, Jr. is the president, chief operating officer and majority shareholder of TJS.[2] Pignataro is also responsible for the day-to-day operations of TJS. Environmental Hearing Board Adjudication and Order, Docket No. 2001–155–K (Consolidated with No.2001–041–K), December 23, 2002 ("EHB Op.2002") at 2, 4–5.

In September 1999, Pignataro and two associates contacted the DEP about the prospect of relocating Tire Derived Products, Inc., ("TDP"), a New Jersey waste tire processing corporation and facility, from New Jersey to Pennsylvania.[3] At that time, DEP officials informed them that a residual waste

---

1. As will be discussed *infra,* the second issue on which petition for allowance of appeal was granted is actually subsumed into the first issue. Thus, the second issue will be examined during consideration of the first question presented.

2. On November 10, 1998, Pignataro was granted a process patent for a manner to recycle used tires. EHB Op.2002 at 5. The patent describes a method of sorting used tires through visible inspection and inflation testing. After sorting, the tires that cannot be reused on an automobile are shred and/or cut into strips that can produce different products at various stages of the cutting and shredding process.

3. Pignataro was formerly the president and a minority shareholder of TDP. He was also responsible for the daily operation of the facility. From 1996 to 2000, TDP operated a waste tire processing facility first

processing facility permit issued pursuant to Pennsylvania's Solid Waste Management Act, the Act of July 7, 1980, P.L. 380, *as amended,* 35 P.S. § 6018.101 *et seq.* ("SWMA"), would be needed for the establishment and operation of a waste tire processing and recycling facility in Pennsylvania. Pignataro and his associates then submitted an application to the DEP for an Industrial Development Grant for Waste Tires to fund the establishment of a waste tire processing/recycling facility in Pennsylvania based upon the model set forth in Pignataro's patent. TJS claimed that the paperwork to operate the facility pursuant to a General Permit for Processing/Beneficial Use of Residual Waste, specifically, Residual Waste General Permit No. WMGR038 ("DEP Permit"), was being submitted to the DEP. EHB Op.2002 at 6–7.[4]

in Newark, New Jersey, and later in Elizabeth, New Jersey. TDP acquired large quantities of used whole tires at the Elizabeth facility that were either sold for reuse as automobile tires or cut and then sold for use in the manufacture of recycled rubber products. Although TDP never obtained a Certificate of Occupancy from Elizabeth, it commenced operations at the facility. In September 1999, financial difficulties and disputes with the property owner led TDP to decide that the Elizabeth location was no longer viable. Pignataro and several associates considered relocating the business to Pennsylvania. TDP finally vacated the Elizabeth property in April 2000, leaving approximately 100,000 waste tires. EHB Op.2002 at 5–8. On December 21, 2000, the New Jersey Department of Environmental Protection ("NJDEP") issued a Notice of Violation ("NOV") for operating the Elizabeth Facility without the required permits and for the potentially hazardous situation created by TDP. On February 16, 2001, the NJDEP issued an Order and Civil Penalty Assessment to TDP and Pignataro and ordered the removal of all waste tires and debris from the Elizabeth Facility within 30 days and issued a $50,000 civil penalty against TDP. EHB Op.2002 at 17–19. By May 2001, the NJDEP, considering the Elizabeth facility a serious environmental hazard, rescinded its February 2001 Administrative Order and filed a complaint against TDP and Pignataro in the New Jersey Superior Court. EHB Op.2002 at 21. Between May and June of 2001, the City of Elizabeth spent approximately $364,000 to remove and properly dispose of the waste tires left at the TDP's Elizabeth Facility. In January 2002, New Jersey Superior Court found TDP and Pignataro liable for the payment of $300,000 in statutorily authorized penalties. EHB Op.2002 at 23.

4. Under the Residual Waste Regulations, a "General permit" is defined as a:

regional or Statewide permit issued by the Department for a specified category of beneficial use or processing of solid waste, the terms and

While awaiting a response on the requested DEP grant, Pignataro and his associates began negotiations for a lease on the Fairless Hills site in November 1999. That same month, DEP officials met with Pignataro at the TDP facility in Elizabeth to view the type of facility Pignataro and his associates proposed. During that visit, the DEP again informed Pignataro that a DEP Permit would be necessary to conduct such an operation in Pennsylvania. In February 2000, the DEP notified Pignataro and his two associates that their venture did not qualify for a grant.

Notwithstanding the grant denial, TJS entered into a five-year lease for the Fairless Hills Facility with USX Corporation and assumed occupancy on May 1, 2000. Despite the fact that it had not applied for nor had it obtained any permits required by the DEP or Falls Township, TJS began accepting discarded used whole tires at the facility in early June 2000. Additionally, TJS failed to register to do business in Pennsylvania with the Pennsylvania Department of State. DEP

conditions of which allow an original applicant, a registrant and person or municipality that obtains a determination of applicability, to operate under the permit if the terms and conditions of the permit and certain requirements of this article are met.
25 Pa.Code § 287.1. Specifically applicable here, the DEP, in August 1996, issued General Permit No. WMGR038, which governs waste tire processing and/or beneficial use of waste tires and/or tire-derived material. Persons or entities approved under the General Permit are obliged to comply with various state and local requirements. The terms of the General Permit also noted that the DEP had determined that waste whole tires and/or tire derived material:
(1) can be used as fuel for cement production, steel production, power generation and other industrial operations; and (2) as feedstock for the production of crumb rubber which, in turn, may be used in such products as new tires, molded rubber products, carpets, flooring, "astroturf" underlay, extruded products, automotive brakes, asphalt modifier for roads and athletic surfaces, moisture retainer for turf development, railroad grade crossings and footwear; and the processing and beneficial use can be adequately regulated using general conditions.
26 Pa. Bull. 4273 (Aug. 31, 1996). The General Permit further provided that persons requesting approval to operate under its terms are required to obtain a "Determination of Applicability" for each site where tires and/or tire derived materials will be processed or beneficially used. Finally, the General Permit set forth in detail the information required to secure a "Determination of Applicability."

Order and Civil Penalty Assessment, January 22, 2001 ("DEP January 2001 Order") at 1. As the Commonwealth Court explained:

> Tire Jockey's fully-implemented operation was to consist of three parts: (1) the sale of serviceable tires, *i.e.,* tires which can be re-used as tires; (2) the sale of cut component pieces of non-serviceable tires, *i.e.,* tires which can no longer be used as tires; and (3) the manufacturing of rubber mats and crumb rubber (Percofill), which is used as a playground safety covering. The serviceable tires would be identified, categorized by size, branded, stored as inventory and made available for sale. The non-serviceable tires would be cut into five component pieces: the tread section; two side-walls; and two intact metal beads. The tread sections and metal beads would be sold for the manufacture of recycled rubber products, for tire-derived fuel or for scrap. The steel-free sidewall sections would be retained and used by Tire Jockey as raw material for the manufacture of Percofill or rubber mats.

*Tire Jockey Ser., Inc. v. Dep't of Envtl. Prot.,* 836 A.2d 1026, 1027 (Pa.Cmwlth.2003); *see also* EHB Op.2002 at 10.

Via letter dated June 27, 2000, TJS advised the Falls Township Manager that it intended to occupy the Facility in Fairless Hills. Falls Township responded that, prior to occupying the building, TJS was required to complete a Township Use and Occupancy Permit and have various inspections performed by Falls Township. Despite receipt of the Falls Township communication, TJS continued to operate the Facility with none of the required permits or inspections. TJS received a Notice of Violation ("NOV") on July 26, 2000 from the Falls Township Code Enforcement Officer for operating the Facility without a license and the Falls Township Fire Marshall noted numerous code violations, which were required to be cured before issuance of a Use and Occupancy Permit. On July 28, 2000, TJS finally applied to Falls Township for a Use and Occupancy Permit and paid the fees for the license and inspections. EHB Op.2002 at 9.

The DEP first conducted an on-site inspection of the Facility on August 1, 2000 at which time the DEP observed: approximately 1,500 to 3,000 whole used tires at the Facility; numerous cut, processed and baled used tires inside and outside the building; and TJS employees operating machinery that processed the used tires. EHB Op.2002 at 10; *see also* DEP January 2001 Order at 2. During the inspection, the DEP informed Pignataro that the operations conducted at the Facility constituted residual waste processing which required a permit. The DEP also advised Pignataro that conducting such operations without a permit was a violation of the law and provided him with a copy of the SWMA and the applicable Residual Waste Regulations ("RWR"). The DEP official then told Pignataro to cease operations until TJS obtained a permit. *Id.*

Following the inspection, the DEP issued a NOV on August 16, 2000 for violations observed during the August 1, 2000 inspection. Specifically, the NOV cited TJS for processing used tires without a residual waste processing facility permit in violation of the SWMA and 25 Pa.Code §§ 293.201(a) and 297.201(a) of the DEP's RWRs.[5] The NOV also requested that TJS submit to the DEP, within fifteen days, a proposed plan and schedule for the correction of the violations. EHB Op.2002 at 10–11; *see also* DEP January 2001 Order at 2.

By letter dated August 28, 2000, TJS responded to the DEP claiming that, while it intended to comply with the DEP RWRs, it could not begin the DEP permit application process until it was certain TJS would receive municipal approval. Following a request from TJS, Pignataro and the DEP met to discuss permitting and compliance with DEP Rules and

---

**5.** Section 293.201 provides in relevant part:

A person or municipality may not own or operate a transfer facility unless the Department has first issued a permit to that person or municipality for the facility under this chapter.

25 Pa.Code § 293.201(a). In pertinent part, Section 297.201 provides:

A person or municipality may not own or operate a residual waste processing facility, unless the Department has first issued a permit to that person or municipality for the facility under this article.

25 Pa.Code § 297.201(a).

RWRs on September 20, 2000. During the meeting, DEP officials informed TJS that all of the used tires, whole or cut, must be removed from the Facility immediately in order to comply with DEP Rules and RWRs, because a DEP permit was needed before TJS could lawfully begin operations at the Facility. The DEP officials also advised TJS that its compliance with DEP Rules and RWRs would have a direct impact on the permitting process. The DEP officials then provided TJS with application materials for a determination of applicability under a DEP Permit. EHB Op.2002 at 10–11; *see also* DEP January 2001 Order at 2–3.

The DEP performed a second inspection on September 25, 2000 at which time DEP officials observed approximately one-hundred pallets of stacked tire pieces outside the Facility and numerous whole tires stored both inside and outside the Facility.[6] The DEP conducted a third inspection on October 26, 2000. The DEP again observed pallets of stacked tire pieces outside the Facility, a considerable number of whole tires on the loading dock and inside the Facility, and noted that more tires had been brought onsite since the August 1, 2000 inspection. DEP personnel also observed TJS employees receiving and sorting whole used tires. EHB Op.2002 at 11–12. During this inspection, Pignataro informed the DEP officials that he did not view the tires at the Facility as waste tires, and he therefore believed that TJS was not storing waste tires in violation of DEP Rules and RWRs. Environmental Hearing Board, Opinion and Order on Petition for Supersedeas, Docket No. 2001–155–K (Consolidated with 2001–041–K), December 17, 2001 ("EHB Op.2001") at 6. On October 27, 2000, the DEP issued a second NOV for violations observed the day before and requested that TJS submit, within fifteen days, a plan and schedule for correction of the violations. DEP January 2001 Order at 3.

---

**6.** Also in September 2000, the Falls Township Fire Marshall conducted an inspection, and TJS was subsequently issued the requisite Falls Township Use and Occupancy Permit in October 2000. EHB Op.2002 at 12.

The DEP conducted a fourth inspection of the Facility on November 2, 2000 wherein the same violations as found in the previous inspections were noted. EHB Op.2002 at 12; DEP January 2001 Order at 3. On December 12, 2000, TJS filed an application/request for determination of applicability under DEP Permit No. WMGR038. Approximately one week later, the DEP conducted a follow-up inspection to ascertain the approximate number of whole and cut used tires at the Facility. Pignataro admitted that more used tires had been brought onsite and the DEP again informed Pignataro that the activities taking place at the Facility required a permit. The DEP estimated that there were now approximately 20,000 unprocessed, processed and baled tires stored outside the Facility and approximately 30,000 of the same inside the Facility. DEP officials also requested that TJS provide documents evidencing the number of all incoming and outgoing used tires at the facility. Pignataro stated that he was unable to provide such records. EHB Op.2002 at 13; DEP January 2001 Order at 3.

The DEP again advised TJS by letter dated December 27, 2000, that its general permit application was incomplete and requested additional information concerning its relevant compliance history. Moreover, the DEP requested an updated calculation of the proposed amount of bonding for the tires at the Facility. TJS then supplemented its application with a compliance history that failed to mention the previous NOVs issued by the DEP, or the NOV issued by the NJDEP regarding the Elizabeth Facility. TJS's supplemental filings also failed even to mention the existence of TDP. TJS further supplemented its application by including a revised bond calculation. TJS maintained that bonding was needed only for waste tires. Relying on its theory that most or all of the tires at the Facility were not waste tires, TJS then claimed that only a minimal amount of bonding was required. Thus, the revised bond calculation reduced the number of waste tires at the Facility and significantly lowered the required bond amount from $26,145 to $11,970. EHB Op.2002 at 17–19.

On January 22, 2001, the DEP issued the aforementioned administrative Order and Civil Penalty Assessment, finding that TJS began operating a residual waste processing facility in June 2000, and continued to operate, without the requisite permit. EHB Op.2002 at 13–14; *see also* DEP January 2001 Order at 4. Specifically, the DEP found that TJS's activities constituted violations under 35 P.S. §§ 6018.301 (management of residual waste), 6018.302(a) and (b)(3) (disposal, processing and storage of residual waste); unlawful conduct under 35 P.S. §§ 6018.501 (permits and licenses required; transition scheme; reporting requirements), 6018.610(2), (4) and (9) (unlawful conduct); a public nuisance under 35 P.S. § 6018.601; and a danger of pollution to the waters of the Commonwealth under 35 P.S. § 691.402. The DEP also noted that the violations subjected TJS to civil penalties under 35 P.S. § 6018.605. Thus, pursuant to the enforcement provisions in the SWMA, 35 P.S. § 6018.602, the Clean Streams Law, 35 P.S. § 691.610, and the Administrative Code, 71 P.S. § 510–17, the DEP ordered the following:

1. [TJS] shall immediately cease accepting and processing waste tires at the [Facility] without a permit from the Department.

2. [TJS] shall remove all waste tires from the [Facility] within 30 days of the date of this Order and dispose of them at a lawfully permitted facility.

3. Within forty-five (45) days, [TJS] shall submit to the Department all records including but not limited to invoices, disposal receipts, and bills of lading relating to the disposal of waste tires from the [Facility].

4. Within thirty (30) days of the date of this Order, [TJS] shall pay a civil penalty of **FIFTY–FOUR THOUSAND DOLLARS ($54,000)** for the violations set forth in [the Order]. . . .

DEP January 2001 Order at 4. TJS appealed the DEP January 2001 Order within 30 days of its receipt. EHB Op.2002 at 3; *see also* EHB Op.2001 at 7. TJS did not file for supersedeas.

Between March and November 2001, the DEP performed three inspections of the TJS Facility. At each inspection, the DEP officials discovered that TJS had ignored its order, as additional used tires had been brought to the Facility. With regard to TJS's DEP Permit application, by letter dated March 12, 2001, the DEP sent TJS a Technical Deficiency Letter requesting additional compliance history information and detailed the deficiencies of TJS's bonding calculations. In requesting further bonding information from TJS, DEP stressed that all tires and tire-derived material at the Facility were to be treated as waste for purposes of bonding. On April 17, 2001, TJS responded to the DEP by providing additional information regarding its shareholders, yet failed to comply with any of the other DEP requests. Further, TJS again omitted all information concerning the NOVs and Orders against it in Pennsylvania and New Jersey. EHB Op.2002 at 19–21.

In May 2001, the NJDEP informed the DEP of the actions taken against TDP and Pignataro. The DEP then denied TJS's DEP Permit application via letter dated June 8, 2001. The DEP found that TJS had failed to demonstrate that its proposed operations at the Facility were consistent with the terms and conditions of DEP Permit WMGR038. Further, the DEP's denial noted a deficient compliance history and a clash over bonding for the Facility. The DEP concluded that TJS had demonstrated a lack of intention or ability to comply with environmental laws. *See* 35 P.S. § 6018.503; *see also* EHB Op.2001 at 8; EHB Op.2002 at 3–4, 22–23.[7]

There was no movement on TJS's appeal of the DEP January 2001 Order and penalty until October 2001, when the DEP filed a petition in the Commonwealth Court to enforce the Order. The Commonwealth Court scheduled a hearing on the DEP petition for November 2001 and TJS filed a petition for supersedeas with the EHB, in conjunction with a petition

---

7. Section 6018.503(c) of the SWMA grants the DEP broad powers to "deny, suspend, modify, or revoke any permit or license" if it finds that the applicant, *inter alia,* failed to comply with relevant environmental statutes, regulations or orders, or failed to show an ability or intention to comply.

for temporary supersedeas arguing that its appeal of the DEP January 2001 Order should be heard before any enforcement proceeding. The DEP agreed to an adjournment of the enforcement petition before the Commonwealth Court, pending the decision of the EHB's supersedeas proceeding. EHB Op.2002 at 23; *see also* EHB Op.2001 at 7.

TJS also appealed the denial of the DEP Permit, and the EHB consolidated that appeal with the petition for supersedeas. However, the EHB ultimately considered only the petition for supersedeas from the DEP January 2001 Order because, under normal circumstances, no supersedeas lies from a permit denial. EHB Op.2001 at 8–9.

On December 17, 2001, the EHB issued its opinion and order. The EHB noted that the number of tires had tripled at the Facility since January 22, 2001 and that TJS had continued to accept and triage used tires. Further, due to inadequate record keeping, TJS did not know how many tires it currently stored or how many it was taking in on a daily basis. As a result of this situation, the Falls Township Fire Marshall issued a NOV to TJS citing TJS for the illegal storage of tires outside and inside the building. EHB Op.2001 at 9–10.

Further, the EHB was not convinced that TJS would likely succeed on the merits of its claim that its non-reusable tire operations are not subject to regulation under the RWRs. The EHB explained that TJS would have a difficult time showing that its activities and used tires fall within the exception to the regulatory definition of "waste," and would more clearly fall within the definition of "processing." "Waste" is defined under the RWRs as:

(i) Discarded material which is recycled or abandoned. A waste is abandoned by being disposed of, burned or incinerated or accumulated, stored or processed before or in lieu of being abandoned by being disposed of, burned or incinerated. A discarded material includes contaminated soil, contaminated water, contaminated dredge material, spent mate-

rial or by-product recycled in accordance with subparagraph (iii), processed or disposed.

(ii) Materials that are not waste when recycled include materials when they can be shown to be recycled by being:

(A) Used or reused as ingredients in an industrial process to make a product or employed in a particular function or application as an effective substitute for a commercial product, provided the materials are not being re-claimed. . . . Sizing, shaping or sorting of the material will not be considered processing for the purpose of this subclause of the definition.

(B) Coproducts.

(C) Returned to the original process from which they are generated, without first being reclaimed or land disposed. The material shall be returned as a substitute for feed-stock materials. When the original process to which the material is returned is a secondary process, the materials shall be managed so that there is no placement on the land and the secondary process takes place onsite.

(iii) The following materials are wastes, even if the recy-cling involves use, reuse or return to the original process (as described as follows):

(A) Except for coproducts, materials used in a manner constituting disposal, or used to produce products that are applied to the land.

(B) Except for coproducts, materials burned for energy recovery, used to produce fuel or contained in fuel.

(C) Materials accumulated speculatively.

(iv) Discarded or recycled material may not be waste if a determination is made by the Department in accordance with § 287.7.

(v) In enforcement actions implementing the act, a person who claims that the material is not a waste in accordance with subparagraph (ii) shall demonstrate that there is a known market or disposition for the material, and that the terms of the exclusion have been met. In doing so, appro-priate documentation shall be provided (such as contracts

showing that a second person uses the material as an ingredient in a production process) to demonstrate that the material is not a waste. In addition, owners or operators of facilities claiming that they actually are recycling materials shall show that they have the necessary equipment to do so.

25 Pa.Code § 287.1. The RWRs define "processing" as follows:

(i) The term includes one or more of the following:

(A) A method or technology used for the purpose of reducing the volume or bulk of municipal or residual waste or a method or technology used to convert part or all of the waste materials for offsite reuse.

(B) Transfer facilities, composting facilities and resource recovery facilities.

(ii) The term does not include a collection center that is only for source separated recyclable materials, including clear glass, colored glass, aluminum, steel and bimetallic cans, high-grade office paper, newsprint, corrugated paper and plastics.

25 Pa.Code § 287.1.

The EHB noted that TJS did not sell any products that could be manufactured from the used tires, there were no contracts for the sale of such products and there was no evidence that there was even a viable market for such products. Therefore, even if TJS's activities and used tires fell within the exception to the definition of "waste," it failed to fulfill the requirement that there be a "known market or disposition for the material." *See* 25 Pa.Code § 287.1; *see also* EHB Op.2001 at 18–19.

The EHB also viewed TJS's alleged irreparable harm as "illusory and self-inflicted" because the EHB was unwilling to allow TJS to operate without a permit when TJS had proved no likelihood that the Facility could be run without such a permit. The EHB also noted that the following circumstances influenced its decision: TJS had failed to move any of the used tires from its Facility since the DEP January 2001 Order, TJS still accepted used tires and TJS waited almost one year to

take issue with the DEP January 2001 Order. EHB Op.2001 at 19–20.

Accordingly, the EHB refused to supersede the sections of the DEP January 2001 Order that required TJS to immediately cease accepting and processing used tires, and to remove all non-reusable tires from the Facility. However, the EHB granted a limited and conditional supersedeas to the extent that the DEP January 2001 Order required TJS to dispose of used tires that could be sold for reuse as tires. The supersedeas was conditioned on TJS posting a bond in the amount of $74,891 within seven days of the EHB Order. EHB Op.2001 at 1–2, 21–22, 24–25. When TJS failed to comply with the conditions of the supersedeas grant, the EHB vacated the grant on January 7, 2002. EHB Op.2002 at 2.

Thereafter, in February 2002, the Commonwealth Court held a hearing on the DEP Petition to Enforce the DEP January 2001 Order. As a result of the hearing, the Commonwealth Court ordered TJS, *inter alia*, to remove and properly dispose of all waste tires from the Facility within thirty days. Following the Commonwealth Court's order, the DEP performed another inspection of the facility. DEP officials noted that TJS had amassed approximately 75,000 whole used tires and 42,000 used tire equivalents in cut pieces. EHB Op.2002 at 23.

In June 2002, the EHB held hearings on TJS's appeal of the DEP January 2001 Order and the DEP permit denial. On December 23, 2002, the EHB rendered its decision. The EHB first found that the Waste Tire Recycling Act, 35 P.S. § 6029.101 *et seq.* ("WTRA") does not trump the SWMA. The EHB noted that the WTRA does not include a provision that it is to be read *in pari materia* with the SWMA. The EHB also found that the WTRA was not intended to circumscribe the jurisdiction of the DEP over used tires under the SWMA. To the contrary, referencing Section 6029.105 of the WTRA, the EHB held that the WTRA actually expands DEP oversight of used tires. EHB Op.2002 at 27–28.[8]

8. Section 6029.105 of the WTRA provides for the powers and duties of DEP as follows:

The EHB further held that the tires accumulated at the Facility constituted "waste" subject to the SWMA and the RWRs. Specifically, the EHB found that the used tires at the Facility did not fall within the subparagraph (ii)(A) exception to the definition of "waste" in the RWRs. By considering the plain language of the regulation and crediting the DEP's reasonable interpretation of the regulation under *North American Refractories,* 791 A.2d 461, the EHB determined that this exception applies only when the material is recycled or reused. The EHB concluded that the used tires accumulated by TJS are discarded consumer products, which TJS then processes. Additionally, the EHB noted that TJS's interpretation that its used tires are excluded from the definition of "waste" was rejected by the Commonwealth Court in *Starr v. Department of Environmental Resources,* 147 Pa.Cmwlth. 196, 607 A.2d 321, 323–24 (1992). The EHB further noted that *Starr* was approved by the Commonwealth Court in *Booher v. Department of Environmental Resources,* 149 Pa.Cmwlth. 48, 612 A.2d 1098, 1101–02 (1992) and most recently accepted by this Court in *Commonwealth v. Packer,* 568 Pa. 481, 798 A.2d 192, 196–97 (2002). EHB Op.2002 at 30–35.

Moreover, the EHB held that the used tires accumulated by TJS do not fit within the definition for source-separated recyclable materials under Section 287.1 of the RWRs.[9] Again following the DEP's interpretation, the EHB agreed that source separated recyclable materials include only those materials which are specifically listed in the pertinent regulation.

The department shall have the power and its duty shall be to:
(1) Administer the whole used or waste tire management program pursuant to the provisions of this act.
(2) Consult with the Department of Revenue concerning matters of tax credit disbursements.
(3) Cooperate with local units of government and appropriate private businesses in carrying out the duties of this act.
(4) Regulate the disposal of waste tires.
35 P.S. § 6029.105.

9. Each definition contains, in essence, the same following language: "The term does not include a collection or processing center that is only for source separated recyclable materials, including clear glass, colored glass, aluminum, steel and bimetallic cans, high-grade office paper, newsprint, corrugated paper and plastics." 25 Pa.Code § 287.1.

Also, the EHB found that the environmental and safety hazards associated with the accumulation of waste tires supports such a position. EHB Op.2002 at 35–38.

Furthermore, the EHB held that the DEP had the legal authority to issue the DEP January 2001 Order under the SWMA and the RWRs, and had proven the violations therein. The EHB also found that the measures imposed by the DEP January 2001 Order were "a reasonable means of curing the violations, and consequently, [the] DEP [had] carried its burden of proving that the DEP January 2001 Order was properly issued." Additionally, the EHB upheld the DEP's civil penalty assessment against TJS. EHB Op.2002 at 38–41.

In conclusion, the EHB held that the DEP's denial of TJS's DEP Permit was proper for two reasons. First, in the face of the DEP's insistence that TJS bond the entire amount of tires present at the Facility, TJS had refused to bond the required amount. Second, considering the operations in Pennsylvania and New Jersey, the EHB found that Pignataro clearly demonstrated a lack of ability or intention to comply with environmental laws, regulations and agency orders. EHB Op.2002 at 41–46.

TJS then appealed to the Commonwealth Court, which vacated the order of the EHB and remanded for further consideration in a published opinion. *Tire Jockey Ser., Inc.,* 836 A.2d 1026. The panel first considered whether the tires at the Facility fell within the exception to the definition of "waste" in the RWRs. The panel interpreted the plain language of subparagraph (ii)(A) of the definition as follows:

Subparagraph (ii) of the definition states that materials are *not* waste when they are being used *or* reused as ingredients in an industrial process to make a product or employed in a particular function or application as an effective substitute for a commercial product, *provided the materials are not being reclaimed.* By definition, reclaiming involves "processing" which, in this subclause does *not* include "sizing, shaping and sorting." This means that, when materials are "sized, shaped and sorted" in connection with their use or

reuse as an ingredient in an industrial process or as an effective substitute for a commercial product, the materials are not being "processed" or "reclaimed" and, therefore, are *not* "waste."

*Tire Jockey Ser., Inc.*, 836 A.2d at 1030. The panel found that TJS simply sorts, shapes, separates and cuts its used tires, and does not "process" or "reclaim" the used tires. The panel held that, under subparagraph (ii), used tires are not considered "waste" "once it can be shown that the tires *will* be recycled by being used or reused as an ingredient in an industrial process to make a product or by being employed in a particular function or application as an effective substitute for a commercial product." *Id.*

The panel next considered whether TJS had demonstrated that the used tires at the Facility would be recycled in the manner described in Section 287.1 of the RWRs. The panel noted that because the EHB had erroneously found that subparagraph (ii) applies only to materials that **are being** recycled, rather than **will be** recycled, the EHB failed to address the question. Consequently, the panel vacated and remanded to the EHB for findings of fact and conclusions of law regarding whether TJS's used tires are not "waste" under subparagraph (ii) because "there is a known market or disposition for its tires at the Fairless Hills Facility and because the tires will be used or reused as ingredients in an industrial process or as an effective substitute for a commercial product." *Id.* at 1031.

On November 14, 2003, the DEP filed an application for reargument, which the Commonwealth Court denied by order dated December 29, 2003. The DEP then filed a petition for allowance of appeal with this Court, which was granted. Before this Court, the DEP, citing *North American Refractories*, 791 A.2d 461, argues that its interpretation of the RWRs is entitled to great deference, as long as its interpretation is not clearly erroneous. The DEP charges that it was an error of law for the Commonwealth Court to reverse the EHB's determination that the DEP's interpretation of the specific regulation was reasonable, and to advance a different interpre-

tation, without first discussing the mandates of the SWMA or whether the DEP's interpretation of the regulation is consistent with the SWMA.

The DEP, as appellant before this Court, contends that its interpretation of the regulation at issue is reasonable and consistent with the SWMA. The DEP argues that the used tires obtained and stored by TJS are "waste" as defined in 25 P.S. § 287.1, thus making the Facility a waste transfer facility which requires a permit for operation.[10] As for the exception to the definition of "waste" relied upon by TJS, the DEP interprets the exception as applying to waste derived materials that are ready for use as effective substitutes for commercial materials and for which known markets exist. The DEP explains that when "the conversion is complete, and the resulting material is able to be shown to be recycled, without further processing, in one of the ways described in subparagraph (ii), this regulatory scheme excludes that material ... from the definition of 'waste,' thus allowing it to enter and compete in the marketplace as a 'product,' free from the permitting and other requirements that are inherent in the waste classification." Appellant's Brief at 26.

The DEP explains that the purpose of the "sizing, shaping or sorting" language in the regulation is to prevent a material derived from waste that is ready to be employed as an effective substitute for a commercial product from being disqualified because it is later smoothed off; slightly reduced in size; or sorted by color, shape or size to meet the more stringent needs of a particular customer. Thus, under the

10. A "transfer facility" is defined as follows in the RWRs:

A facility which receives and processes or temporarily stores municipal or residual waste at a location other than the generation site, and which facilitates the transportation or transfer of municipal or residual waste to a processing or disposal facility. The term includes a facility that uses a method or technology to convert part or all of the waste materials for offsite reuse. The term does not include a collection or processing center that is only for source separated recyclable materials, including clear glass, colored glass, aluminum, steel and bimetallic cans, high-grade office paper, newsprint, corrugated paper and plastics.

25 Pa.Code § 287.1.

DEP interpretation of the RWRs, if a material must be sized, sorted or shaped in order to reach a point where it could be used as an effective substitute for a commercial product, that sizing, shaping and/or sorting is considered processing and therefore would require that the facility obtain a processing permit. The DEP argues that the "sizing, shaping or sorting" language does not even come into play in the instant case regarding the whole used tires that TJS obtains because the whole used tires are not material that is ready to be used or reused as a substitute for a commercially produced product. Moreover, the DEP asserts that TJS's operation of cutting whole used tires is not sizing or shaping because it does not produce smaller tires, but rather, produces distinct materials, none of which are equivalent to a tire.

The DEP further argues that the Commonwealth Court's interpretation of subparagraph (ii)'s "sizing, shaping and sorting" language is in direct opposition to the DEP's interpretation and effectively renders the DEP's primary tool to effectuate the SWMA's legislative purpose, the waste permitting process,[11] unavailable with regard to facilities that convert waste materials into effective substitutes for commercial products. The DEP argues that the Commonwealth Court's interpretation of the regulation would permit operators of used tire facilities to legally amass vast amounts of used tires without any DEP oversight, which would cause a serious hazard to public health, safety, welfare and the environment, in contravention of the SWMA.[12] The DEP argues that its interpretation of subparagraph (ii) is also reasonable because of its protection of public health, safety and welfare through DEP oversight of the waste processing facilities, and its protection

11. The SWMA requires "permits for the operation of municipal and residual waste processing and disposal systems, licenses for the transportation of hazardous waste and permits for hazardous waste storage, treatment, and disposal." 35 P.S. § 6018.102(3).

12. A stated purpose of the SWMA is to "protect the public health, safety and welfare from the short and long term dangers of transportation, processing, treatment, storage, and disposal of all wastes." 35 P.S. § 6018.102(4).

of the environment through the encouragement of the beneficial use of solid waste and recycling.

Finally, the DEP contends that it was an error of law for the Commonwealth Court to have made findings of fact and conclusions of law with regard to whether TJS's activities are limited to sizing, shaping and sorting, when the EHB had not reached the issue. The DEP argues that even if the Commonwealth Court's interpretation of the regulation is allowed to stand, this Court nevertheless should vacate the Commonwealth Court's findings of fact and conclusions of law and modify the remand order to direct the EHB to make the appropriate findings of fact and conclusions of law on this issue.

In response, TJS argues that no deference is owed to the DEP's interpretation of the RWRs because that interpretation is erroneous and unreasonable. Specifically, TJS contends that the Commonwealth Court correctly paid no deference to the DEP's interpretation because the DEP: (1) ignored and/or contradicted the plain language of the regulation; (2) ignored and/or contradicted the interpretive comments of the Environmental Quality Board ("EQB"); and (3) directly contradicted an opinion of the DEP's general counsel's office regarding an essentially identical issue, and thus, the DEP's view is not consistent throughout the Commonwealth.

TJS notes that the exception to the regulatory definition of "waste" actually encompasses two separate exceptions, one for materials "[u]sed or reused as ingredients in an industrial process to make a product," and another for materials that are "employed in a particular function or application as an effective substitute for a commercial product." 25 Pa.Code § 287.1. TJS argues that the DEP ignores the first exception in its brief and claims that the first exception contradicts the DEP's interpretation that the exception applies after some recycling takes place. TJS maintains that if a raw material, used tires here, can be used "as ingredients in an industrial process to make a product," the exception clearly applies. TJS avers that its "industrial process" involves the cutting and shredding of used tires to create tire derived fuel from the

treads,[13] crumb rubber from the sidewalls and weaved tire rubber mats from used tire pieces. In each case, TJS claims that it presented evidence concerning the marketability of the product. Therefore, TJS argues that the DEP's interpretation that a material will no longer be considered "waste" only after the material has been used in an industrial operation to manufacture a product is illogical.

As to the second exception, TJS contends that the DEP's analysis is fatally flawed as it ignores the fact that a waste material may immediately be employed as an effective substitute for a commercial product. TJS asserts that the DEP's assumption that some processing is necessary to convert materials from "waste" to materials that are ready for use as substitutes for commercial products is invalid, noting that approximately 40% of incoming used tires TJS obtains can immediately be re-used as tires without any processing.

Moreover, TJS contends that the opening phrase of the exception to the definition of "waste"—i.e., "[m]aterials that are not waste when recycled include materials when they can be shown to be recycled by being . . ."—contradicts the DEP's interpretation of the regulation because if the regulation was meant to exclude materials after they had been recycled or converted into a product, the regulation easily could have been written that way, but it was not. Thus, TJS reasons that a material is not "waste," but rather a raw material, if the material that would otherwise be considered "waste" is going to be used as an ingredient in an industrial process to make a

13. As an alternative argument, TJS suggests that tire derived fuel is a "coproduct," defined in relevant part in the RWRs as:

material generated by a manufacturing or production process, or a spent material, of a physical character and chemical composition that is consistently equivalent to the physical character and chemical composition of an intentionally manufactured product or produced raw material, if the use of the material presents no greater threat of harm to human health and the environment than the use of the product or raw material.... A coproduct determination ... only applies to materials that will be applied to the land or used to produce products that are applied to the land[.]

25 Pa.Code § 287.1. Coproducts are covered by separate exceptions from the definition of waste. However, TJS offers no argument to support this claim, and thus we will not pass upon it.

product. TJS claims that the used tires at the Facility are simply there for use as an ingredient in the manufacture of tire derived fuel, crumb rubber and weaved mats.

In any event, TJS argues that the DEP's interpretation of the exception to the definition of "waste" appears nowhere in the regulation itself. TJS interprets the exception to the definition of "waste" as containing no language that materials must be processed or converted before the exception to the definition of "waste" may apply.

Furthermore, TJS asserts that because the regulation provides that "[s]izing, shaping or sorting of the material will not be considered processing for the purpose of this subclause of the definition," it is clear that the exception applies to the material before the sizing, shaping or sorting takes place. TJS maintains that the shredding and cutting at its Facility merely changes the size and shape of the tire and does not change its essential make-up. TJS argues that the processing exception was included in the regulation to make clear that the exception applied to simple types of processing. TJS claims that a material that requires sizing, shaping or sorting before it can be used as an industrial process or as a substitute for a commercial product is not considered "waste" under the regulation, and thus is not subject to DEP permitting regulations. Therefore, TJS contends that if the processing operations of a facility are limited to sizing, shaping and sorting of the waste material, that facility is exempt from obtaining a permit.

Consequently, TJS argues that the Commonwealth Court did not commit an error of law by making a finding of fact because it did not make a finding of fact, but merely applied the mostly undisputed evidence concerning the nature of TJS's operation. TJS maintains that the Commonwealth Court properly applied the plain language of the regulation to the instant case and concluded that TJS's operations did not require a DEP permit.

Moreover, TJS maintains that the Commonwealth Court opinion does not divest the DEP of authority to regulate the activities of tire recycling and/or storage facilities. TJS at-

tests that there are stringent waste storage regulations, and that the DEP has plenary authority to enforce the regulations. TJS maintains that the regulations themselves provide objective standards for DEP enforcement. TJS explains that illegal tire dumping is illegal now, just as it was before.

Turning back to the question of administrative deference, TJS cites Sections 180–1 (delineating composition of EQB) and 510–20 (listing powers and duties of EHB, including the power to formulate, adopt and promulgate the DEP rules) of the Administrative Code of 1929, and notes that the EQB, an entity separate from the DEP, promulgates environmental regulations. *See* 71 P.S. §§ 180–1; 510–20. Therefore, in TJS's view, "great deference" need not be paid to the DEP's administrative interpretation. Indeed, TJS asserts that if there is a conflict between the DEP's interpretation and the EQB's explanatory and interpretive comments, the EQB's interpretation should prevail.[14] TJS then maintains that the comments of the EQB make clear that the recycling exception applies "upfront" to material that is "potentially recyclable," *i.e.,* waste materials before processing and recycling. Accordingly, TJS argues that the exception to the definition of "waste" applies to used tires when they are at a facility that has the equipment, markets and intent to recycle used tires.[15]

■ Additionally, TJS argues that the DEP's interpretation of the exception to the definition of "waste" contradicts an earlier interpretation forwarded by the General Counsel for the Southeast Regional DEP Office. TJS references a 1992 memo written by the General Counsel concerning a tire recycling facility, wherein the author concluded that most of the tire recycling to create crumb rubber, tire derived fuel and other manufactured products, if not all, did not require a

14. The EQB comments referenced by TJS accompanied the regulation when published in the Pennsylvania Bulletin. The EQB's comments are not included with the regulation as published in the Pennsylvania Code.

15. For example, the EQB commented: "The final-form regulations expand the exemptions in the definition of 'waste' to exclude, up front, material reused offsite as an ingredient in manufacturing." Reproduced Record at 71A, 31 Pa. Bull. 238 (January 13, 2001).

permit because the materials qualified as coproducts under the RWRs.[16]

TJS also claims that the DEP's interpretation contradicts the interpretation by three other regional DEP offices, and thus, there is no uniformity within the DEP itself. TJS claims that Pignataro anonymously called three DEP regional offices, spoke to Solid Waste Specialists, and inquired whether a permit would be needed for an operation involving a retiree making weaved rubber mats out of used tires in his garage. In all cases, TJS alleges, the Solid Waste Specialists informed Pignataro that a permit would be unnecessary under the RWRs.[17]

16. Here, TJS references an April 1992 draft internal legal memorandum, wherein a DEP attorney rendered an opinion for staff members concerning application of the RWRs to a waste tire shredding facility. The Commonwealth Court failed to mention this memorandum, and in fact, there is no indication that the panel was even aware of it. However, the EHB rejected reliance on this memorandum in the following fashion: "On account of the nature of this document—an opinion from one DEP counsel rendered over 10 years ago concerning a potential application of subsequently-amended regulations to a completely different operation—we assigned no weight to this evidence and disregarded it when reaching our decision." EHB Op.2002 at 35 n. 11. We see no error in the EHB's conclusion, and thus, will not consider this memorandum further.

17. The Commonwealth Court did not discuss Pignataro's anonymous phone calls, and like the legal memorandum discussed above, there is no indication that they were considered by the panel. However, the EHB did consider Pignataro's alleged phone calls concerning the fictional retiree in his garage. In its findings of fact, the EHB described Pignataro's calls as a "ruse in which he telephoned various DEP officials under false pretenses in an effort to elicit a favorable response regarding a mat-making operation[.] ... [Pignataro] did not identify himself or provide any information concerning [TJS] or the operations at the [Facility]. Instead, he falsely stated that he was merely a retired gentleman who wanted to purchase some equipment for that purpose. He then asked ... whether he would need a permit to make rubber mats in his garage using strips of rubber cut from tires." EHB Op.2002 at 21. The EHB further explained that, at trial, "Pignataro admitted to this series of lies to environmental authorities and labeled his approach as 'somewhat creative.'" Id. The EHB concluded that Pignataro's actions evidenced the "inescapable and obvious conclusion that Mr. Pignataro lacks the ability or intention to comply with environmental laws." Id. at 45. TJS failed to challenge the EHB's findings of fact concerning his phone calls to the DEP. Furthermore, the EHB characterized Pignataro as "evasive and not always

Lastly, TJS offers as an independent ground to affirm the decision of the Commonwealth Court an argument that the used tires accumulated at the Facility are source separated materials, the processing and collecting of which are exclusions to the definition of both "processing" and "transfer facility" under the RWRs. TJS contends that its operation involves only tires, that those tires are separated at their source from other forms of waste, and that the used tires are recyclable materials. Thus, TJS argues that under the plain language of the regulation, its used tires qualify as source separated materials. Citing *Pennsylvania Human Relations Commission v. Alto–Reste Park Cemetery Association*, 453 Pa. 124, 306 A.2d 881, 885 (1973) and *Everett v. Harron*, 380 Pa. 123, 110 A.2d 383, 385 (1955), TJS dismisses the argument that the materials listed after the word "including" is exhaustive and instead claims that under Pennsylvania law, it is well settled that the word "including" is considered to be a term of extension and/or enlargement, rather than a term of limitation.

In reply, the DEP stresses that processing is not a requirement in order for a material to qualify for the exception to the definition of "waste." The DEP notes that it has been and still is its position that any waste derived material that is ready, without the need for further processing, for use as an ingredient in an industrial process to make a product or as an effective substitute for a commercial product, for which known markets exist, can qualify for the exception, whether or not that material resulted from the conversion via processing of a waste material. However, the DEP asserts that when a waste material is not immediately ready to be used as a substitute for a commercial product and is converted at a facility to a different material that qualifies for the exception, that is waste processing for which a permit is required.

The DEP also adverts that under the definition of "waste," material that is "recycled" [18] by being "reclaimed" [19] does not

completely truthful[.]" *Id.* This Court will not further consider TJS's argument premised on these phone calls.

**18.** Material is "recycled" under the RWRs "if it is used, reused or reclaimed." 25 Pa.Code § 287.1.

qualify for the exception at issue. The DEP explains that under the exception to the definition of "waste," "processing that converts a material that is not immediately ready for use as an effective substitute for a commercial product into one that is ready to be used in that fashion is reclamation, and a material that is subject to reclamation does not qualify for the exception, even though the reclamation may result in a material that does." Reply Brief at 3.

The DEP further argues that the reusable whole used tires at the Facility are not immediately, without processing, ready for use as an effective substitute for a commercial product because in order to determine which tires fit into this category, visual inspections and pressure testing are required. This inspection and testing, the DEP asserts, constitutes processing under the RWRs. *See* 25 Pa.Code § 287.1. The DEP maintains that there is no record evidence of a commercial product that has the same characteristics as a reusable whole used tire. In other words, a reusable whole used tire is not an effective substitute for a new tire in terms of its useful life and traction. Moreover, the DEP claims that, although the sidewall sections of the used tires may be utilized for playground cover, this does not make the sidewall sections an effective substitute for commercially produced playground cover.

In addition, the DEP takes issue with TJS's assertion that the materials at the Facility are used as ingredients in the industrial process. The DEP asserts that it did not discuss this portion of the exception to the definition of "waste" because it does not apply to any activities at the Facility. Utilizing a dictionary definition of "ingredient," the DEP claims that for something to constitute an ingredient there must be a compound, combination or mixture involved, which is not the case with any of the materials at the Facility.

Also, the DEP notes that there is no conflict between its interpretation of the regulation in question and the comments of the EQB. The DEP argues that the conflicts TJS alleges are based upon TJS's misapprehension of the DEP's interpre-

---

19. Material is "reclaimed" under the RWRs "if it is processed to recover a useable product, or if it is regenerated." 25 Pa.Code § 287.1.

tation of the regulation. When considered in the context of the actual DEP interpretation of the regulation, there is no conflict between the EQB comments and the DEP interpretation. Furthermore, the DEP asserts that it is the Commonwealth Court's treatment of the DEP interpretation of the regulation which is at issue before this Court. The DEP notes that the Commonwealth Court did not consider the comments of the EQB, and therefore, the EQB comments should not be considered by this Court in its review of the Commonwealth Court.

In response to TJS's "second independent reason to affirm the decision of the Commonwealth Court," the DEP argues that used tires are not "source separated recyclable materials." The DEP asserts that the EHB considered and rejected this argument, finding the DEP's interpretation of what constitutes source separated materials reasonable. The DEP attests that it has consistently interpreted source separated recyclable materials to include only those materials that are specifically listed in the relevant regulation. Here, the DEP notes, the list does not include used tires.

The matter for decision is not simple. Before proceeding to the legal principles at issue, it is valuable to note the rudiments of environmental administration in the Commonwealth. The administrative structure that governs environmental regulation in Pennsylvania consists of three independent, yet inter-related branches: the EQB, the DEP and the EHB. The EQB in essence is the administrative legislative branch, which is responsible for "developing a master environmental plan for the Commonwealth," and formulating, adopting and promulgating rules and regulations for the DEP. 71 P.S. § 510–20. The EQB consists of various representatives from Commonwealth agencies, with the secretary of the DEP acting as chairperson. 71 P.S. § 180–1. Concerning the SWMA, the EQB has the power and duty to "adopt the rules, regulations, criteria and standards of the [DEP] to accomplish the purposes and to carry out the provisions" of the SWMA. 35 P.S. § 6018.105. The DEP is the "executive branch, assigned various duties to implement and enforce environmental

statutes and regulations." *N. Am. Refractories,* 791 A.2d at 462. *See, e.g.,* 35 P.S. § 6018.104 (powers and duties of DEP under SWMA). The EHB is the administrative judicial branch, which has the power and duty to "hold hearings and issue adjudications ... on orders, permits, licenses or decisions of the [DEP]." 35 P.S. § 7514(a). *See also* 35 P.S. 6018.108 (powers and duties of EHB under SWMA).

 On appellate review, a court shall affirm a decision of the EHB,

> unless it shall find that the adjudication is in violation of the constitutional rights of the appellant, or is not in accordance with law, or that the provisions of Subchapter A of Chapter 5 (relating to practice and procedure of Commonwealth agencies) have been violated in the proceedings before the agency, or that any finding of fact made by the agency and necessary to support its adjudication is not supported by substantial evidence. If the adjudication is not affirmed, the court may enter any order authorized by 42 Pa.C.S. § 706 (relating to disposition of appeals).

2 Pa.C.S. § 704; *see also Suburban Manor/Highland Hall Care Ctr. v. Com., Dep't of Pub. Welfare,* 545 Pa. 159, 680 A.2d 867, 869 (1996); *Chester Residents Concerned for Quality Living v. Com., Dep't of Envtl. Res.,* 542 Pa. 410, 668 A.2d 110, 112 (1995). The main question before this Court is whether the DEP's interpretation of the RWRs is entitled to deference. This issue is a question of law, and thus, our review is plenary. *See Popowsky v. Pa. Pub. Util. Comm'n,* 910 A.2d 38, 48 (Pa.2006); *Eagle Envtl. II, L.P. v. Com., Dept. of Envtl. Prot.,* 584 Pa. 494, 884 A.2d 867, 877 (2005).

 This Court follows a two-step analysis when reviewing an agency's interpretation of its governing regulations: (1) whether the interpretation of the regulation is erroneous or inconsistent with the regulation, and (2) whether the regulation is consistent with the statute under which it was promulgated. *See Pelton v. Com., Dep't of Pub. Welfare,* 514 Pa. 323, 523 A.2d 1104, 1107–08 (1987); *Com., Dep't of Pub. Welfare v. Forbes Health Sys.,* 492 Pa. 77, 422 A.2d 480, 482 (1980).

Furthermore, when an agency adopts a regulation pursuant to its legislative rule-making power, as opposed to its interpretive rule-making power, it is valid and binding upon courts as a statute so long as it is (a) adopted within the agency's granted power, (b) issued pursuant to proper procedure, and (c) reasonable.[20] *Popowsky,* 910 A.2d at 53 (quoting *Rohrbaugh v. Pa. Pub. Util. Comm'n,* 556 Pa. 199, 727 A.2d 1080, 1085 (1999), citing *Girard Sch. Dist. v. Pittenger,* 481 Pa. 91, 392 A.2d 261, 263 (1978), citing in turn K.C. DAVIS, 1 ADMINISTRATIVE LAW TREATISE § 503, at 299 (1958)). Here, the EQB promulgated the regulation at issue pursuant to its authority to formulate, adopt and promulgate regulations for the DEP, clearly a legislative rule-making power. *See* 71 P.S. § 510–20.[21]

 When a court reviews a regulation issued pursuant to an agency's legislative rule-making power, the court may not substitute its own judgment for that of the agency. To demonstrate that the agency has exceeded its administrative authority, "it is not enough that the prescribed system of accounts shall appear to be unwise or burdensome or inferior to another. Error or lack of wisdom in exercising agency power is not equivalent to abuse. What has been ordered must appear to be so entirely at odds with fundamental principles as to be the expression of a whim rather than an exercise of judgment." *Hous. Auth. of County of Chester v. Pa. State Civil Ser. Comm'n,* 556 Pa. 621, 730 A.2d 935, 942 (1999) (citing *Girard,* 392 A.2d at 263, citing in turn *AT & T v. United States,* 299 U.S. 232, 236–37, 57 S.Ct. 170, 81 L.Ed. 142

**20.** When evaluating the deference owed to an administrative agency's interpretation of its own regulation, this Court has often applied one or the other of the two tests discussed in text above. Most recently, in *Popowsky,* we harmonized the two tests with the result being a uniform and joint application. Accordingly, we utilize that construct here.

**21.** This Court recognizes a "distinction in administrative agency law between the authority of a rule adopted pursuant to an agency's legislative rule-making power and the authority of a rule adopted pursuant to interpretive rule-making power." *Elite Indus., Inc. v. Pa. Pub. Util. Comm'n,* 574 Pa. 476, 832 A.2d 428, 431 (2003). A rule adopted via an agency's legislative rule-making authority is "the product of an exercise of legislative power by an administrative agency." *Rohrbaugh,* 727 A.2d at 1085.

(1936)). Regarding the reasonableness prong, "appellate courts accord deference to agencies and reverse agency determinations only if they were made in bad faith or if they constituted a manifest or flagrant abuse of discretion or a purely arbitrary execution of the agency's duties or functions." *Rohrbaugh*, 727 A.2d at 1085 (citing *Slawek v. State Bd. of Med. Educ. and Licensure*, 526 Pa. 316, 586 A.2d 362, 365 (1991)).

Here, neither party disputes that the regulation is consistent with the SWMA, was adopted within the granted power or was issued pursuant to proper procedure. Therefore, we concern ourselves only with whether the DEP's interpretation of the regulation is erroneous or inconsistent with the regulation and whether the DEP's interpretation of the regulation is reasonable.[22]

Preliminarily, we reject TJS's argument that the DEP's interpretation is entitled to no deference because it is the EQB, and not the DEP, which promulgated the regulation. The DEP relies upon *N. Am. Refractories* to support its main argument that deference is owed to its interpretation of the regulation. 791 A.2d 461. In *N. Am. Refractories*, the Commonwealth Court considered whether the EHB must defer to the DEP's interpretation of a DEP regulation when the EHB determines that the interpretation is reasonable. The Commonwealth Court found that the DEP's interpretation is entitled to great deference unless its interpretation is clearly erroneous. Specifically, the court held that the DEP is "empowered to authoritatively interpret environmental regulations" in the Commonwealth because "[t]hat power is a

---

**22.** During the pendency of this litigation, the General Assembly passed amendments to the WTRA clarifying the definition of "waste tire," and defining "waste tire recycling facility" and "recycled tire product." *See* 35 P.S. §§ 6029.104, 6029.106(c) (P.L. 23, No. 7, § 1 (adopted February 14, 2006, effective April 17, 2006)). The General Assembly also made clear that a permit under SWMA is required for the operation of a facility that recycles waste tires. *Id.* These amendments mirror the position and interpretation of the DEP in the instant case, concerning what constitutes waste tires and when a permit is required under the SWMA. Because these amendments were made following our grant of the petition for allowance of appeal and oral argument, and operate prospectively, they have no direct bearing on the case at hand.

necessary adjunct of the [DEP's] authority to enforce environmental regulations." *Id.* at 466.

Although the DEP does not promulgate its own regulations, we agree with the Commonwealth Court that the DEP, the enforcement and implementation branch of environmental administration in the Commonwealth, is in the best position to interpret DEP regulations. *See N. Am. Refractories,* 791 A.2d at 466. Out of the three entities which comprise the environmental structure in the Commonwealth, the DEP possesses the greatest working knowledge of and practical experience with the environmental regulations. The fact that environmental regulation is governed via a tripartite system in the Commonwealth does not in any way diminish the specialized knowledge and expertise of the DEP, which is borne of its daily operations, *i.e.,* implementation and enforcement of the Commonwealth's environmental regulations.[23]

Here, the DEP argued, and the EHB found, that TJS's operations do not fall within the exception to the definition of "waste" in the RWRs. We note that, in the past, this Court has held that the accumulation of used tires constitutes "waste" under the SWMA. *Packer,* 798 A.2d at 197; *see also Booher,* 612 A.2d at 1102. Furthermore, the Commonwealth Court has held that used tires constitute "waste" even if there is a potential to reuse or recycle the used tires. As the Commonwealth Court explained in *Starr,* when another used tire purveyor made such an argument:

> Starr's value-based analysis falters in at least two respects. First, it ignores the express legislative policy in the Act to correct "improper and inadequate solid waste practices

---

**23.** We reject TJS's claim that the DEP's interpretation is not entitled to deference because it conflicts with the EQB's interpretive comments when the regulation was published in the Pennsylvania Bulletin. It is worth noting that TJS fails to cite any authority concerning what role the EQB's comments in the Pennsylvania Bulletin are supposed to play. The EHB rejected the "supposedly contradictory language" of the EQB's comments, noting that, even if the EQB's language could be construed as supportive of TJS's position, which the EHB found questionable, the interpretive comments "cannot overrule the actual language of the regulation." EHB Op.2002 at 32 n. 7. We see no error in this finding.

[which] create public health hazards, environmental pollution[.]" 35 P.S. § 6018.102. Testimony showed that the tires pose a fire danger and harbor mosquitoes and other insects, thus constituting a public health hazard. Second, the value-based analysis ignores the absurd result that a party could escape environmental regulations by simply declaring his waste has value. Accordingly, the Board properly found that the tires on Starr's property were municipal waste and subject to regulation.

*Starr*, 607 A.2d at 323–24 (footnotes omitted).

The Commonwealth Court, however, rejected the EHB's plain language interpretation, and thus the DEP's interpretation, that the exception to the definition of "waste" applies **when** material is recycled and instead found that the proper plain language reading of the exception applies to materials that **will be** recycled. The Commonwealth Court then held that TJS's operations do not constitute "processing" or "reclaiming" because the panel viewed TJS's activity as merely sizing, sorting and shaping the used tires. This holding was key to the Commonwealth Court's decision because waste material that is processed or reclaimed does not qualify for the exception to the definition of "waste." However, under the definition of "waste," "sizing, sorting and shaping" are themselves specifically exempt from the definitions of reclaiming and processing. *See* 25 Pa.Code § 287.1.

In reaching its decision, the Commonwealth Court did not acknowledge the deference standard applicable to evaluation of an agency's interpretation of its own governing regulations, substituted its own independent reading of the regulation, which was at odds with the DEP's and EHB's interpretation, and simply concluded that TJS's interpretation of the "sizing, sorting and shaping" provision was more persuasive. The Commonwealth Court advanced this contrary opinion without discussing the mandates of the SWMA, or whether the administrative interpretation was reasonable or consistent with the regulation. In doing so, the panel plainly erred.

The DEP is charged with implementing and enforcing the purpose of the SWMA. *See* 35 P.S. § 6018.104. In promulgating the SWMA, the General Assembly found that "improper and inadequate solid waste practices create public health hazards, environmental pollution, and economic loss, and cause irreparable harm to the public health, safety and welfare." 35 P.S. § 6018.102;[24] *see also Packer,* 798 A.2d at 198. With this purpose in mind, we turn to the regulation at issue—the exception to the definition of "waste" in the RWRs.

TJS forwards an argument akin to the Commonwealth Court's holding—*i.e.,* the used tires piled up at the Facility are not "waste" because they **will be** recycled for use as a substitute for a commercial product or as an ingredient in an industrial process. Thus, TJS argues that its activities fall within the exception to the definition of "waste" because its used tires are either recycled into a substitute for a commercial product or are utilized as an ingredient in an industrial process after they arrive at the Facility. However, the plain language of the exception to the definition of "waste" provides that such material is not "waste" "**when** recycled[,]" not **before** the material is recycled. 25 Pa.Code § 287.1. Therefore, we agree with the DEP that, because the used tires that TJS accumulates cannot immediately be employed as an effective substitute for a commercial product without some form of processing, and because the used tires at the facility are not an ingredient in an industrial process, TJS's used tires do not

**24.** Included among the purposes of the SWMA are the following: [to]
(1) establish and maintain a cooperative State and local program of planning and technical and financial assistance for comprehensive solid waste management;
(2) encourage the development of resource recovery as a means of managing solid waste, conserving resources, and supplying energy;
(3) require permits for the operation of municipal and residual waste processing and disposal systems, licenses for the transportation of hazardous waste and permits for hazardous waste storage, treatment, and disposal;
(4) protect the public health, safety and welfare from the short and long term dangers of transportation, processing, treatment, storage, and disposal of all wastes[.]
35 P.S. § 6018.102(1–4).

meet the requirements for the exception to the definition of "waste."

Further, the exception to the definition of "waste" applies only to materials that are presently ready for use as ingredients in an industrial process or as effective substitutes for commercial products, without any processing. While recognizing that there may be some types of waste material that may immediately be employed as an effective substitute for a commercial product or as an industrial ingredient, used tires are not such a material. All used tires at the Facility must be processed in some fashion before they can become effective substitutes for commercial products or ingredients in an industrial process. When a tire reaches the Facility, processing begins through visual inspection and pressure testing. Some of the tires are then further sized, sorted, shaped, cut, shredded and baled. If waste material must be processed, it cannot fall within the exception to the definition of "waste." We therefore agree with the DEP that TJS's handling of each used tire at the Facility constitutes "processing" under the RWRs because TJS employs methods or technology "used for the purpose of reducing the volume or bulk of municipal or residual waste or a method or technology used to convert part or all of the waste materials for offsite reuse." 25 Pa.Code § 287.1.[25]

Moreover, it is dubious whether TJS's used tires can be considered ingredients in an industrial operation. The dictionary definition provides that an "ingredient" is "[a]n element in a mixture or compound." THE AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE (4th ed. 2004) (definition of "ingredient"). The DEP maintains that there is nothing in TJS's operations that involve a mixture or a compound. We agree with this interpretation. The used tires are processed

---

25. For our purposes, it is of no import whether there is a known market for the materials TJS produces from the used tires because, in addition to proving such, the terms of the exception to the definition of "waste" must also be met. Here, we agree with the DEP that the used tires at the facility do not fall under the exception to the definition of "waste."

into new, distinct products via cutting and shredding of the used tires.

TJS's operations at the Facility also do not meet the "sizing, shaping or sorting" exception to processing in the definition of "waste." In order for the "sizing, shaping or sorting" exception to apply, the material at issue must be ready for use as an effective substitute for a commercial product or as an ingredient in an industrial process. As mentioned above, the whole used tires at the Facility do not meet this requirement. If a material must be sized, sorted or shaped to become ready to use as an effective substitute for a commercial product or as an ingredient in an industrial process, then the exception does not apply. For whatever use, TJS processes every whole used tire at the Facility through inspection, testing, sizing, sorting, shaping, cutting or shredding. TJS does not merely size, shape and sort the used tires into reusable tires of smaller dimension. The used tires which cannot be reused on an automobile are processed into entirely different, new products.

Considering the foregoing, we are satisfied that the DEP's interpretation is wholly consistent with the regulation at issue and not clearly erroneous. Furthermore, the DEP's interpretation of the regulation, which was approved by the EHB, properly implements the purpose of the SWMA as set forth by the General Assembly. Massive quantities of used tires pose a particular threat to the public health, safety and welfare, and also the environment, especially when not bonded adequately. It is for these reasons that the SWMA requires a permit for the operation of tire recycling facilities. The DEP's power to enforce the law, and thereby to protect the public interest, would be eviscerated if tire recycling facilities, such as the one TJS operated and expanded while avoiding licensure, were not required to obtain a permit and could process used tires without proper regulatory oversight.

Having found the DEP's interpretation consistent with the regulation and not erroneous, it is evident that the DEP's interpretation is also reasonable. There is no evidence

that the DEP's interpretation was made in bad faith, was arbitrarily executed or constituted a manifest abuse of discretion. Thus, because the DEP's interpretation is consistent with the regulation and reasonable, the Commonwealth Court should have afforded deference to the DEP's interpretation.

We agree with the DEP that, in finding that TJS simply sizes, shapes and sorts used tires at the Facility, the Commonwealth Court inappropriately substituted its judgment for that of the fact finder, the EHB. With this point, the second question presented for our review is implicated. We find that the Commonwealth Court plainly erred when it found that TJS does not "process" the whole discarded tires at its facility. Based on the foregoing discussion, it is clear that the Commonwealth Court should have deferred to the interpretation of the DEP, which the EHB adopted, because its interpretation was consistent with the regulation and was reasonable.

Although the Commonwealth Court failed to address TJS's source separated material argument given its other grounds for disposition, in the interests of judicial economy, we will review it here. TJS maintains that the used tires at the Facility are "source separated materials" which qualify for an exclusion under the definition of "processing." The DEP counters that it has consistently interpreted "source separated materials" as those materials that are specifically listed in the relevant regulation. Under the definitions of "processing" and "transfer facility," the relevant provisions here, the lists of materials do not include used tires. *See* 25 Pa.Code § 287.1. There is no mandate that compels the DEP to interpret the regulation as including used tires. To the contrary, we find the DEP's interpretation excluding used tires to be consistent with the regulation and reasonable. Consequently, used tires are not "source separated materials."

Accordingly, we find that the Commonwealth Court should have deferred to the DEP's interpretation of the regulation at issue because the DEP demonstrated that its interpretation is reasonable and consistent with the regulation. Thus, the

116

opinion and order of the Commonwealth Court are reversed and the opinion and order of the EHB are reinstated. Jurisdiction is relinquished.

Former Justices NIGRO and NEWMAN did not participate in the decision of this case.

Chief Justice CAPPY and MESSRS. Justice SAYLOR, EAKIN and BAER join the opinion.