**[J-57-2024] [MO: McCaffery, J.]**

# IN THE SUPREME COURT OF PENNSYLVANIA
## MIDDLE DISTRICT

| | |
|---|---|
| GREEN ANALYTICS NORTH, LLC D/B/A STEEP HILL PA, HANGING GARDENS, LLC, PENNSYLVANIA MEDICAL SOLUTIONS, LLC, CURALEAF PA, LLC, AES COMPASSIONATE CARE, LLC, STANDARD FARMS, LLC, AND PAREA BIOSCIENCES, LLC, | : No. 76 MAP 2023<br>:<br>: Appeal from the Order of the<br>: Commonwealth Court at No. 104<br>: MD 2023 dated June 29, 2023<br>:<br>: ARGUED: September 10, 2024 |
|             Appellees | : |
| | : |
|       v. | : |
| | : |
| PENNSYLVANIA DEPARTMENT OF HEALTH, | : |
| | : |
|             Appellant | : |

## DISSENTING OPINION

**JUSTICE WECHT**                                    **DECIDED: September 25, 2025**

Today's Majority accomplishes an astonishing feat of linguistics. It magically transforms the General Assembly's words "one or more" into the Majority's preferred invention: "more than one." The Majority rewrites the statute without even going through the motions of finding some ambiguity in the statutory language that requires clarification. Instead, asserting that it needs to read language in "context," the Majority decrees that an administrative agency is authorized to promulgate regulations that directly contradict the plain language of the law that the agency is charged with implementing.

The "context" to which the Majority refers is nothing more than the fact that the General Assembly stated some broad policy goals within the statute and delegated

authority to an agency to make regulations. Were there an actual gap to be filled within the statute or a true ambiguity in its text, the sort of statutory construction analysis that the Majority performs might suffice, and it might warrant an interpretation that dovetails with that of the agency. But where, as here, the General Assembly's mandate is clear and free from ambiguity, "context" is not a license to contravene the plain language of the statute. Such rulemaking exceeds, and indeed, contravenes the agency's delegated authority. The Majority's elevation of policy over legislative text fails to heed the proper role of the judiciary. Indeed, it violates that role. From this stark instance of judicial buccaneering, I must respectfully dissent.

We all agree that the validity of the challenged regulation turns upon the *Tire Jockey* test.[1] The critical inquiry thereunder is the scope of the "agency's granted power." This analysis requires us to consult the provision of the Medical Marijuana Act[2] that the regulation seeks to implement.

The issue is straightforward. The relevant statutory provision is Section 704(a) of the Medical Marijuana Act. That law states:

> **(a) General testing.**--A grower/processor shall contract with one or more independent laboratories to test the medical marijuana produced by the grower/processor. The department shall approve a laboratory under this subsection and require that the laboratory report testing results in a manner as the department shall determine, including requiring a test at harvest and a test at final processing. The possession by a laboratory of medical marijuana shall be a lawful use.[3]

---

[1]     *Tire Jockey Serv., Inc. v. Dep't of Env't Prot.*, 915 A.2d 1165, 1186 (Pa. 2007) ("[W]hen an agency adopts a regulation pursuant to its legislative rule-making power, as opposed to its interpretive rule-making power, it is valid and binding upon courts as a statute so long as it is (a) adopted within the agency's granted power, (b) issued pursuant to proper procedure, and (c) reasonable.").

[2]     Act of April 17, 2016, P.L. 84, No. 16, *as amended*, 35 P.S. §§ 10231.101-10231.2110 (the "Medical Marijuana Act" or the "Act").

[3]     35 P.S. § 10231.704(a).

This provision undisputedly requires independent laboratory testing of medical marijuana, mandates that laboratories performing such testing be approved by the Department of Health, and directs the Department to require two different tests—"a test at harvest and a test at final processing." By mandating that growers/processors contract with "one or more" independent laboratories, Section 704(a) unambiguously authorizes growers/processors to contract with "one" laboratory or, alternatively, "more" than one. In contrast to this statute, the challenged regulation instead demands that growers/processors utilize two separate laboratories for the required testing, *i.e.*, one laboratory for the harvest batch and a second, different laboratory for the processed product.[4]

The conflict is self-evident and glaring. The agency's "Two-Lab Requirement" eliminates the "one" laboratory option that the General Assembly expressly authorized. The Majority dismisses this observation as "simplistic sophistry."[5] The Majority's quarrel is with the General Assembly, because the "sophistry" is a straightforward consequence of the incompatibility between the statute and the regulation. The General Assembly said "*one or more*." Undeterred, the Department chooses to say "*more than one*" or "*at least two*." This is facially impermissible. "One or more" is a distinctive construction. We must presume that the legislature chose it deliberately. Under the plain language of this phrase, the statute contemplates a universe of potential scenarios in which the required testing is performed at "one" laboratory. If it did not, then there would be no reason to

---

[4] 28 PA. CODE § 1171a.29(c)(1) ("An approved laboratory shall test samples from a harvest batch or harvest lot prior to using the harvest batch or harvest lot to produce a medical marijuana product."), (c)(2) ("An approved laboratory *other than the one that tested the harvest batch or harvest lot* shall test samples from each process lot before the medical marijuana is sold or offered for sale to another medical marijuana organization.") (emphasis added).

[5] Maj. Op. at 13.

specify "*one* or more."  Section 704(a) does not refer to "laboratories" in the abstract, and it certainly does not say "as many laboratories as the Department may select."  Rather, the statute says "one or more" laboratories.  "One" necessarily must be an option.

The Department and the Majority appear to believe that their role is to improve upon the statute rather than to apply it.  They prefer to frame Section 704(a) as implicitly empowering the Department to select between the alternatives of "one" laboratory or "more" than one.  The grammar and structure of Section 704(a) demand the opposite.[6] The subject of a sentence is the "noun or noun phrase about which something is said in the predicate of a simple sentence," or "the doer of the sentence's action or the person or thing that is in the state expressed by the predicate."[7]  The subject of the sentence in question is a "grower/processor."  The grower/processor is directed to ("shall") contract with "one or more" laboratories.  The next sentence assigns duties to the Department. The first sentence does not mention the Department.  It is addressed solely to growers/processors.  The clear meaning of this provision it is that growers/processors may satisfy their duty to have their product tested at "one" laboratory "or," alternatively, "more" than one laboratory.  The Department-invented Two-Lab Requirement mandates otherwise.

For purposes of the *Tire Jockey* test, the Two-Lab Requirement was not "adopted within the agency's granted power."[8]  "Clearly the legislature would not authorize

---

[6]     "Words and phrases" in a statute "shall be construed according to rules of grammar and according to their common and approved usage."  1 Pa.C.S. § 1903(a).

[7]     BRYAN A. GARNER, GARNER'S MODERN AMERICAN USAGE: THE AUTHORITY ON GRAMMAR, USAGE, AND STYLE 918 (3d ed. 2009).

[8]     *Tire Jockey*, 915 A.2d at 1186.

agencies to adopt binding regulations inconsistent with the applicable enabling statutes."[9] Rather, "all regulations, whether legislative or interpretive 'must be consistent with the statute under which they were promulgated.'"[10] Upon identifying a facial conflict between the statute and the regulation, our analysis cannot go any further. Agencies have no authority to contradict statutes. Nor do we.

The Majority does not acknowledge this principle. The Majority instead gives dispositive weight to its understanding of "context,"[11] which it uses to override the ordinary meaning of the words in Section 704(a)—the application of which the Majority castigates as an "obsessive focus on individual words" and "an excessive focus on the common definitions of words used in a statute."[12] If we are not to be bound by the common meaning of words, then statutory interpretation has no limiting principle. The Majority declares that there is "an often-unstated tension between the command to consider the statute in context and the command to give words their common meaning."[13] Be that as it may, any tension here is a consequence of the Majority's rejection of the common meaning of the words "one or more." As written, Section 704(a) of the Medical Marijuana Act produces no tension with any other provision of the Act.

---

[9] *Slippery Rock Area Sch. Dist. v. Unemployment Comp. Bd. of Rev.*, 983 A.2d 1231, 1241 (Pa. 2009).

[10] *Id.* (quoting *Popowsky v. Pa. Pub. Util. Comm'n*, 910 A.2d 38, 53 (Pa. 2006)).

[11] Maj. Op. at 9, 10, 11, 13.

[12] *Id.* at 11, 13 n.9; *but see* 1 Pa.C.S. § 1903(a) ("Words and phrases shall be construed according to rules of grammar and *according to their common and approved usage*; but technical words and phrases and such others as have acquired a peculiar and appropriate meaning or are defined in this part, shall be construed according to such peculiar and appropriate meaning or definition.") (emphasis added).

[13] Maj. Op. at 9.

The Majority gives two examples of circumstances in which "context" purportedly may override the common meaning of words, both of which are sourced from Section 1903(a) of the Statutory Construction Act, and neither of which applies here. The Majority notes that, when a statute provides an express definition for a term, "we do not ignore the context in favor of giving the word its common meaning."[14] Whether this is truly an example of using "context" to interpret a statute is questionable; the Majority is merely describing the act of applying a provided definition. Regardless, there is no express definition in the Medical Marijuana Act that supports the Majority's reading of Section 704(a). The General Assembly presumably did not find it necessary to define the words "one," "or," or "more." The Majority's second example is no more helpful—"Nor do we give a word its common meaning when it is clear the word is used in a specialized, technical fashion."[15] "One or more" is not a technical phrase or a term of art. These are words that are easily understood by any reader. Because neither of the Statutory Construction Act's exceptions to the common-usage rule applies here, we must apply the common meaning of the phrase "one or more," notwithstanding the Majority's objections to "excessive" or "obsessive" focus on the meaning of words.[16]

The examples of "contextual" readings that the Majority provides differ markedly from its substantive rationale. When one looks to a statutory definition or a specialized usage, one is seeking to understand the meaning of words in a statute. The Majority here does nothing of the sort. The "context" that the Majority weighs so heavily is not anything that sheds light on the meaning of the words "one or more independent laboratories." The "context" that the Majority invokes is the fact that the Medical Marijuana Act gives the

---

[14]     *Id.* at 10 (citing 1 Pa.C.S. § 1903(a)).

[15]     *Id.* (citing 1 Pa.C.S. § 1903(a)).

[16]     *Id.* at 11, 13 n.9.

Department regulatory authority, and that the General Assembly stated certain policy goals in Section 102 of the Act.[17] Neither informs the interpretation of Section 704(a). The provisions that grant regulatory authority to the Department and empower it to promulgate regulations do just that—they do not aid in interpreting any other provision of the Act. To conclude otherwise is to write a blank check to the agency to devise any regulation whatsoever. And while the policy aims stated in Section 102 could be helpful in construing an ambiguous provision in the Act, they do not illuminate the meaning of the words "one or more independent laboratories," which are plain on their face.

It is that last matter—the goals of the Act—that occupies the foreground of the Majority's policy-over-text approach. The Majority's focus upon policy goals as a source of statutory "context" is merely statutory construction by another name. The problem, however, is that the Majority is skipping a critical step. Although we may, in construing unclear language, consider matters such as the "mischief to be remedied" and the "object to be attained" by the statute, these indicia of legislative intent are available only "[w]hen the words of the statute are not explicit."[18] Where, as here, "the words of a statute are clear and free from all ambiguity," then "the letter of it is not to be disregarded under the pretext of pursuing its spirit."[19] As we have said many times before, "the plain language of the statute 'provides the best indication of legislative intent.'"[20]

Notably, the Majority does not find that the language of Section 704(a) of the Medical Marijuana Act is ambiguous. Again: "A grower/processor shall contract with one

---

[17]     *See id.* at 14 ("We therefore must look to the rest of the Act, and especially (1) the explicit declaration of policies and (2) the explicit enabling statutes included in the Act.").

[18]     1 Pa.C.S. § 1921(c).

[19]     *Id.* § 1921(b).

[20]     *Commonwealth v. Lehman*, 311 A.3d 1034, 1044 (Pa. 2024) (quoting *Miller v. Cnty. of Centre*, 173 A.3d 1162, 1168 (Pa. 2017)).

or more independent laboratories to test the medical marijuana produced by the grower/processor."[21]  There is nothing unclear in this sentence.  A grower/processor may meet its testing obligation by contracting with "one" independent laboratory, "or more" than one laboratory.  Whether this is a good policy choice or a bad one is, for our purposes, immaterial.  It does not matter whether the Department's preference for using two separate laboratories would better serve any particular policy aim.  The General Assembly has spoken on the matter.  "The Legislature did not include the power now sought to be confirmed in the [Department].  Whether or not this omission was wise is of no moment to this Court.  Our function is to interpret the statute according to what the Legislature said, not according to what it should have said or might have said."[22]

But even granting (for the sake of argument) the Majority's implicit suggestion that we should apply extrinsic considerations of legislative intent to unambiguous statutory language, and that policy goals should prevail over the common usage of words, the Majority's analysis is riddled with unwarranted assumptions.  The Majority references the portions of Section 102 of the Act which state the General Assembly's intent to promote "patient safety" and "high quality research" into the effectiveness of medical marijuana, and then it simply assumes that the Two-Lab Requirement is essential to advancing those interests.[23]  This is not as obvious as the Majority suggests.

"Accuracy" in test results here becomes the Majority's watchword.  The Majority lauds the legislature's decision to require the use of "independent" laboratories, the "obvious purpose" of which being to "avoid conflicts of interest in generating accurate test

---

[21]     35 P.S. § 10231.704(a).

[22]     *Pennsylvania Hum. Rels. Comm'n v. St. Joe Mins. Corp., Zinc Smelting Div.*, 382 A.2d 731, 736 (Pa. 1978).

[23]     *See* Maj. Op. at 15-17 (discussing 35 P.S. § 10231.102).

results," given that such accuracy is important to the goals of patient safety and encouraging quality research.[24] There is no question that the Act requires laboratories to be independent, and no one disputes that accurate laboratory testing of medical marijuana products is important, both to foster patient safety and to enable high-quality research.

The ostensible purpose of the Two-Lab Requirement, however, is not simply "accuracy" in the abstract. Rather, the point of requiring the use of two separate laboratories is to be able to compare test results from before and after the medical marijuana is processed, which the Department believes will enable it to detect fraudulent test results from unscrupulous laboratories.[25] As the Appellees point out, there are reasons to question this suggestion. Because growers/processors *process* the raw plant material into various forms—"pills, oils, tinctures, topical applications, or liquids," etc.— the harvest batch and the final product often will be entirely different, making a comparison between their test results "akin to comparing apples to oranges."[26] Even under the Two-Lab Requirement, the second laboratory—testing, for instance, a medical marijuana edible—may still engage in the sort of malfeasance that the Department fears. Conceivably, no one would be the wiser because a comparison with the first laboratory's test results from the harvest batch would not be capable of revealing the second laboratory's falsehood vis-à-vis the final product. Either way, there is only one laboratory

---

[24] *Id.* at 17.

[25] *See* Department's Br. at 12-13 (explaining that the impetus for the Two-Lab Requirement was a report addressing allegations that marijuana testing laboratories in other states have falsified data for the benefit of their clients); *id.* at 12 n.5 (citing Lester Black, *America's Pot Labs Have a THC Problem*, FIVETHIRTYEIGHT.COM (June 29, 2021), https://fivethirtyeight.com/features/americas-pot-labs-have-a-thc-problem/ (last visited September 19, 2025)).

[26] Appellees' Br. at 40.

test of the samples of final product before that product ends up in the hands of patients. It may be that the *second* laboratory is the unscrupulous one that produces inaccurate test results, and that the grower/processor would never have contracted with that laboratory but for the Department's Two-Lab Requirement.

The Majority gives great weight to its conclusion that the Two-Lab Requirement furthers the General Assembly's interest in patient safety, but this finding is built upon the assumption that the requirement is essential to obtaining "accurate" results when testing the final product.[27] The Majority never connects those dots. It does not explain the grounds for its implicit conclusion that the use of "*one* or more" independent laboratories, as the General Assembly expressly allowed in Section 704(a), would produce *inaccurate* test results of the final products. The same is true of the Majority's reliance upon the policy goal of fostering high-quality research. The Majority simply assumes that requiring the use of two separate laboratories will produce accurate test results that are presumably needed for research purposes.[28] The Majority does not explain why it believes that the sort of research that the General Assembly contemplated in Section 102 is dependent upon a comparison between one laboratory's testing of a harvest batch (*i.e.*, apples) and a separate laboratory's testing of the final product (*i.e.*, oranges). It seems more likely that the research institutions in question would care principally about the quality of the final product that they are using in their research, regardless of whether the harvest batch from which it was produced was tested by the same laboratory or a different one.

---

[27] *See* Maj. Op. at 19 ("While it is possible to imagine that the Legislature did not desire **accurate** percentages on the label, it strains credulity to call such an attribution reasonable. . . . Accurate results therefore contribute to two of the explicit goals for the Act as set forth by the Legislature in Section 102.") (emphasis in original).

[28] *Id.* at 17 ("Needless to say, high quality research requires high quality, accurate testing. As but one example of many, consider whether clinical trials can support any meaningful scientific conclusions if clinicians cannot accurately determine how much THC they are administering to patients enrolled in the trial.").

A perplexing addition to the Majority's reasoning is its suggestion that the Two-Lab Requirement is essential to detecting and preventing the unlawful diversion of medical marijuana.[29]  It is wholly unclear why this would be the case.  Even under the Two-Lab Requirement, the testing is performed only on "samples" of the harvest batch and final product.[30]  There is no indication that independent laboratories are monitoring the entirety of a grower/processor's harvest and preventing the diversion of some portion thereof.  Nothing in the Two-Lab Requirement prevents a grower/processor from transmitting samples to any number of laboratories, and then proceeding to unlawfully divert thousands of pounds of medical marijuana.  To the extent that the Majority fears unlawful diversions by laboratories, rather than growers/processors, it remains just as unclear how the Two-Lab Requirement does anything to prevent such chicanery.  As discussed above, perhaps it is the second laboratory required by the Department (but not by the Act) which is the source of the problems.  It is likely that this portion of the Majority's analysis is lacking in explanation because the Two-Lab Requirement has nothing to do with the prevention of unlawful diversion of medical marijuana.

Maybe the Majority is correct in all of its assumptions about the salutary effects of the Two-Lab Requirement.  And maybe not.  By pointing out the leaps in the Majority's logic—that two laboratories automatically equate to accurate test results and, thus, patient safety, etc.—I mean to illustrate the pitfalls that a court faces when it embarks on a freewheeling exploration of policy goals.  We are better served by adherence to the text of the statute before us, rather than our own impressions of the reasons for various

---

[29]    *Id.* at 19-20 ("Accurate test results of harvest batches and final processing are reasonably necessary to ensure that a grower/processor is not diverting medical marijuana for unlawful purposes. . . . And it is inescapable that having a second independent laboratory involved in testing would help detect and deter such illegal diversions by laboratories.  In fact, it may be the only way to do so.").

[30]    *See* 28 PA. CODE § 1171a.29(c)(1)-(2).

legislative policy determinations, or the wisdom thereof. It is the letter of the law that binds, not our own perceptions of what the law should have said.

We should proceed with greater caution than the Majority exhibits today, lest our example lead future courts to stray even further from the restraining hand of fidelity to statutory text, and to plunge into an unbounded conception of "context" as a license to disregard the letter of the law "under the pretext of pursuing its spirit."[31]

I respectfully dissent.

Justice Brobson joins this dissenting opinion.

---

[31] 1 Pa.C.S. § 1921(b).